IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs July 23, 2013

**STATE OF TENNESSEE v. GARY S. HOLMAN**

**Direct Appeal from the Criminal Court for Knox County**
**No. 92152B     John Kerry Blackwood, Judge**

---

**No. E2012-01143-CCA-R3-CD - Filed January 27, 2014**

---

The defendant, Gary S. Holman, stands convicted of aggravated burglary, employing a firearm in the commission of a dangerous felony, false imprisonment, first degree felony murder, and especially aggravated robbery. He is currently serving an effective sentence of life plus eleven years. On appeal, the defendant contends that: (1) the trial court erred by not allowing extrinsic evidence to be used to impeach a witness under Tennessee Rules of Evidence Rule 613(b);(2) that the trial court erred by allowing prejudicial photographs of a victim into evidence; and (3) that the evidence is insufficient to support his convictions. Following review of the record, we conclude that the evidence is sufficient to support the convictions. However, the petitioner's remaining two issues are waived for failure to prepare an adequate record on appeal. As such, the judgments of conviction are affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the Court, in which JEFFREY S. BIVINS, J., joined and NORMA MCGEE OGLE, J., concurred in part and dissented in part.

Richard L. Gaines, Knoxville, Tennessee, for the appellant, Gary S. Holman.

Robert E. Cooper, Jr., Attorney General and Reporter; Deshea Dulany Faught, Assistant Attorney General; Randall Nichols, District Attorney General; and Ta Kisha Fitzgerald, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**Procedural History**

The charges against the defendant arose from his participation in a home invasion burglary which resulted in the death of one of the residents. Vickie Graves testified that she and her husband, Bill, were inside their home on the evening of May 2, 2009, watching a movie in their living room. Ms. Graves testified that she heard a sensor located in their driveway go off twice, which indicated the presence of someone or something, and saw a motion-sensor flood light come on at the end of the house. As Mr. Graves went towards the front door to investigate, a man, later identified as co-defendant Josh Bowman, rushed into the house and grabbed Mr. Graves in a "bear hug." Ms. Graves testified that a second man, the defendant, immediately followed Mr. Bowman inside the home. According to Ms. Graves, the defendant was armed with a handgun. The defendant immediately approached Ms. Graves and ordered her to sit down. When she refused, the defendant put the gun to her head and tried to push her down onto the couch. Ms. Graves continued to refuse to sit.

At the same time, a struggle was continuing between Mr. Graves and Mr. Bowman. When Mr. Graves saw that his wife had a gun pointed at her head, he broke free from Mr. Bowman and ran behind the love seat. During this time, Ms. Graves heard a "pop," and she screamed for her husband, who did not answer. According to Ms. Graves, the "pop" distracted the defendant, and she pushed him backwards, causing him to fall over a basket. She dove beside a chair where a gun and ammunition were kept, and she managed to retrieve the gun. She pointed the weapon at the defendant and told him that she was going to blow his head off. Ms. Graves pulled the trigger of the gun several times, but nothing happened.

The defendant proceeded to grab Ms. Graves and the gun, and a struggle between the two ensued. During the scuffle, the pair fell over a coffee table and knocked over various furniture. While this was occurring, Ms. Graves heard Mr. Bowman yell at the defendant to "get the safe," to which the defendant replied that he could not because she had a gun. The scuffle between the two continued, and, at some point, Ms. Graves was able to pull down the toboggan and bandana covering the defendant's face and see him clearly by the light of the television. During this struggle, the defendant eventually bit Ms. Graves on the arm and was able to wrest the gun away from her. At that point, he "pushed [her] head down into [the] loveseat." The defendant then retrieved a safe from the closet near the front door before running out of the house. Ms. Graves continued to lie on the loveseat, and she heard Mr. Bowman come from the back of the home and exit the front door as well.

After first attempting to pursue the two men to possibly see their car, Ms. Graves returned to the house and discovered her husband, bleeding profusely, on the floor between the bedroom and the living room. She immediately called 911 and tried to stop the bleeding by applying pressure to the wound in her husband's upper thigh. The ambulance and police arrived on the scene, and Mr. Graves was rushed to the hospital where he endured several surgeries prior to passing away approximately twenty-four hours later.

While at the hospital with her husband, Ms. Graves was interviewed by the police and related the events of the evening. During the recorded interview, with regard to the man later identified as the defendant, Ms. Graves stated that he "did not seem to want to hurt [her.]" She also made the statement that, while she was sure that the defendant had pointed something with a barrel at her head, she "couldn't swear [the defendant] had a gun in his hand," but stated that it felt like it. She also noted that, while the two did struggle over the gun, the defendant did not hit or strike her at any time, rather he only pushed and shoved her. She also related that the defendant bit her arm, but noted he did not break the skin. Ms. Graves also made the statement that the defendant was either "not very strong or he was real, real gentle with me." Ms. Graves also noted that she had never seen the two men who invaded her home before that evening.

Based upon his actions, the defendant, along with Mr. Bowman and Mr. Chad Medford, were indicted by a Knox County grand jury. On July 21, 2009, the defendant was indicted, in a ten-count indictment, for: two alternative counts of aggravated burglary; two alternative counts of employing a firearm in the commission of a dangerous felony; aggravated kidnapping; three alternative counts of first degree felony murder; and especially aggravated robbery. At trial, the State presented the testimony of Ms. Graves as noted above.

The State also called multiple law enforcement officials to testify. The first witness, Michael Mays with the Knox County Emergency Communications District, testified that on May 2, 2009, a 911 call was received from 9920 Washington Road and that officers from the sheriff's department were dispatched. Officer Frank Phillips with the Knoxville County Sheriff's Department responded to the remote location. Upon approaching the area, he observed a small box, which was open, and some contents lying in the roadway approximately one hundred yards from the residence. He radioed other officers to stop and check the box before he proceeded to the house. Upon entering, Officer Phillips found Ms. Graves kneeling over her husband trying to stop the bleeding. Mr. Graves, who appeared to have a fatal wound, was lying in the floor in an area between the living room and a bedroom. During this initial meeting, Officer Phillips was able to learn from Ms. Graves that two men had entered their home and fought with her husband before a gun was eventually fired. She explained that her husband had been attempting to retrieve a gun from the bedroom.

The next witnesses called by the State were multiple officers from the forensic services division. Officer Mackenzie Alleman testified that he examined and photographed a large safe which was in the middle of the road on Washington Pike. She noted that the safe had burst open and that contents, mostly coins and papers, were scattered around it. Inside the front door of the home, she found a black toboggan and a loaded Mauser 9-millimeter handgun. Officer Alleman also recovered a spent .45 caliber casing next to the front door, but she noted that the round went through the rear wall, landing near the kitchen sink. In

front of the bedroom door, she recovered a second spent casing. She testified that there was also a large indentation and blood where another round had gone through the bedroom wall, before lodging in a book.

Officer Aaron Allen of the forensic services division also responded to the scene that evening and helped with the collection of evidence and the documentation of the scene. He was responsible for sketching the crime scene, as well as mapping the trajectory of the two bullets discovered in the home. Approximately one week later, Officer Allen returned to the scene to collect a .45 Ruger P97 discovered by a tracking team in the wood line underneath some leaves. The weapon was found approximately 243 feet from the Graves' mailbox.

Officer Tom Finch with the forensic services division also assisted in the collection of evidence in the case. Months later, in January 2010, Officer Finch assisted in the recovery of a Colt .45, which was found by officers across the street from the Graves' residence. It was later determined that the gun belonged to Mr. Graves.

Officer Michael McMahan, also with the forensic division, initially responded to the scene that evening but was rerouted to another call. Several days later, he was responsible for processing a silver Mercury automobile belonging to Mr. Bowman in connection with the case. He discovered what he believed to be smears of blood in the car, and he collected samples for later testing. In the car's trunk, Officer McMahan also found a bandana, a pair of black boots, a toboggan, a glove, and a small black bag. It appeared that there was a blood smear on the boots.

Kimberly Bryant with the Tennessee Bureau of Investigation (TBI) crime lab also testified, stating that she worked in the serology and DNA unit. She received several pieces of evidence in the case for testing, although she was unable to extract DNA profiles from much of it. She did test a pair of work gloves that she received and found that the DNA on the gloves was a "mixture of at least three individuals," with the main contributor being Mr. Graves. However, testing revealed that the defendant could not be excluded as one of the other contributors. Ms. Bryant also tested a pair of work boots and found human blood, which she subsequently identified as Mr. Graves'.

Also testifying was Kevin Warner, a forensic scientist in the firearms identification unit of the TBI. He received multiple pieces of evidence to examine in the case, specifically a .45 caliber Ruger pistol, two fired cartridge cases, a bullet jacket and fragment, another bullet, a magazine from the pistol, and three unfired cartridges. After testing, Mr. Warner determined that the two fired cartridges had been shot from the Ruger pistol. He also determined that the bullet and bullet jacket were fired from that same pistol.

Don Carmen, also with the TBI firearms identification unit, testified that several months after Mr. Warner's examination of the Ruger pistol, a second gun was submitted for examination. Mr. Carmen explained that the gun was a colt 45 and was not in workable condition when he received it. After soaking the gun, he was able to fire the gun.

Dr. Steven Cogswell, with the Knox County Medical Examiner's Officer, performed an autopsy on the body of Mr. Graves. He noted that Mr. Graves had a gunshot wound, which entered his left buttock, severed his femoral artery and vein, and exited through the thigh. Dr. Cogswell testified that Mr. Graves' leg had received severe damage and that medical personnel had planned to amputate the leg prior to Mr. Graves' death. He testified that there were multiple fasciotomy incisions, one of which obscured the exit wounds, on Mr. Graves, the purpose of which were to relieve pressure from dying muscle and tissue in the body. Looking at crime scene photographs, Dr. Cogswell testified where the victim had been standing when he was shot and observed that the scene was consistent with one who suffered from such a wound.

Detective Brad Hall, a detective with the major crimes unit, also assisted in the case. His only involvement, however, was assisting in the defendant's arrest on May 12, 2009, and participating in an interview with the defendant. In the interview, a statement was given, and the defendant admitted that he and Mr. Bowman had entered the Graves' home with the intent to rob it. However, he was insistent that Mr. Bowman and Mr. Medford had told him that no one would be inside the home when they entered. He acknowledged that he and Ms. Graves engaged in an altercation in the living room, while Mr. Bowman fought with Mr. Graves.

The defendant testified at his trial in a manner consistent with the statement he had given to police. At no time did the defendant ever deny that he was in the home, that he had gone there with the intent to burglarize the home, or that he was involved in an altercation with Ms. Graves.

The defendant testified that he had been friends with Mr. Bowman since high school and that he regularly purchased drugs from Mr. Bowman. The defendant also stated that he had no real residence at the time, and he would stay in a motel with Mr. Bowman when he came to town. On May 1, 2009, the defendant and Mr. Bowman were in a room at a Motel 6, and Mr. Medford arrived. The defendant testified that he did not know Mr. Medford well. However, he was in the room when Mr. Bowman and Mr. Medford were discussing plans for a burglary on the following day. Initially, the two men planned to seek the assistance of the defendant's younger brother to help them.

The next day, Mr. Bowman was not able to locate the defendant's brother so instead

asked the defendant to assist him. Mr. Bowman told the defendant that if he helped them, he would receive pills. The defendant and Mr. Bowman left in Mr. Bowman's car and drove to Mr. Medford's home. The trio waited until it was darker and eventually left the home with Mr. Medford driving Mr. Bowman's car. According to the defendant, Mr. Medford told them that they were supposed to find a safe with money inside it, as well as some "oxies" in the medicine cabinet, inside the home. The defendant was clear that Mr. Medford said that no one was supposed to be home. He also stated that he was not armed, and he saw neither Mr. Medford nor Mr. Bowman with a weapon.

The trio drove by the Graves' home around dusk. The defendant said that he did not see any lights on, but he did see a "blue light" on in the front room "like if you're watching a TV and like if a movie goes off . . . ." He also noted that a blue pickup truck was parked in the driveway. After driving around for awhile, Mr. Medford let the other two out on a side street near the Graves' home. As he was approaching the home, the defendant donned a dark-colored hoodie, a toboggan, a pair of gloves, and wrapped a piece of a shirt around his face. The defendant found these items in Mr. Bowman's car. As the two neared the house, a light clicked on, and the defendant stated that he told Mr. Bowman that he did not feel comfortable doing this. However, Mr. Bowman ran up to the front door and let himself in. The defendant acknowledged that he followed Mr. Bowman inside the home. Once inside, the defendant said he saw Mr. Bowman and Mr. Graves wrestling. He maintained that he never saw Mr. Bowman with a gun. He further claimed that he did not hear any gunshots fired while he was in the home.

At the same time, Ms. Graves began screaming for them not to hurt her husband, and the defendant said he told her that they would not. While admitting that Ms. Graves appeared scared, he denied that he had rushed into the home and put a gun to her head. The defendant said that Ms. Graves went over to a chair and bent down. When she raised up, she was pointing a gun at him and pulling the trigger, although no bullets were discharged. According to the defendant, he grabbed the gun with his left hand, and the two began wrestling. He testified that after Ms. Graves picked up the gun, he got her on the ground and pinned her left arm "under the pit of [his] arm." During the ensuing struggle, the defendant heard Mr. Bowman yell at him to get the safe. The defendant replied that he couldn't because Ms. Graves had a gun. During this struggle, the toboggan the defendant was wearing got pulled down, and Ms. Graves saw the defendant's face. The defendant then saw Mr. Bowman retrieve the safe from the closet and leave the house. At the time, he was still attempting to wrest the gun from Ms. Graves. At some point during the fray, the defendant bit Ms. Graves and pulled back her thumb, as well as pushing her down into the loveseat. After finally getting the gun, the defendant ran out of the house. As he was running, he tossed the gun he had taken from Ms. Graves into a wooded area. Afterwards, the trio went back to the Motel 6. The defendant testified that he did not take any of the proceeds from

the robbery.

It was also established during the investigation that Ms. Graves' nephew was married to the sister of the third co-defendant in the case, Mr. Medford. Ms. Graves' nephew had suffered several strokes and was placed on several medications, which his wife refused to keep in their home. Accordingly, Ms. Graves and her sister took care of him, and Ms. Graves kept the medications in the safe which was eventually stolen from her home by the defendant and co-defendant. However, Ms. Graves' nephew had passed away, and she removed the medications. Thereafter, several important papers and multiple coin collections were kept in the safe. According to Ms. Graves, the only people who knew the location of the safe were herself, Mr. Graves, their son, and her nephew's wife.

At the trial, Ms. Graves specifically testified that she did not comply with the orders given to her by the defendant and that she resisted him at all times.

After hearing all the above evidence, the jury found the defendant guilty of two counts of aggravated burglary, employing a firearm during the commission of a dangerous felony, three counts of first degree felony murder, especially aggravated robbery, and the lesser-included offense of false imprisonment. The trial court subsequently sentenced the defendant to five years on the burglary charges, six years for the firearm conviction, life for the murder convictions, twenty years for the especially aggravated robbery, and eleven months and twenty-nine days for the false imprisonment. The court merged the two burglary convictions, as well as the three murder convictions. After ordering the burglary and firearm convictions to be served consecutively to the remaining sentences, the defendant received an effective sentence of life plus eleven years. The defendant thereafter filed a motion for new trial, which the trial court denied by written order. The defendant has timely appealed.

**Analysis**

On appeal, the defendant raises three issues for our review: (1) whether the trial court erred by not allowing extrinsic evidence to be used to impeach a witness under Tennessee Rule of Evidence 613(b); (2) whether the court erred by allowing prejudicial photos of the victim into evidence; and (3) whether the evidence is insufficient to support each of his convictions. Our review of each issue follows.

**I. Extrinsic Evidence**

First, the defendant contends that the trial court abused its discretion by not allowing him to introduce extrinsic evidence under Tennessee Rules of Evidence Rule 613(b). Specifically, at trial, the defendant requested that he be allowed to introduce the recording

of Ms. Graves' statement to police just hours after the events. According to the defendant, her testimony at trial was "markedly different" from that statement because her "demeanor and attitude were particularly different when comparing her in court testimony to the statement she gave police."

The defendant correctly notes that Rule 613(b) of the Tennessee Rules of Evidence allows for admission of extrinsic evidence of a prior inconsistent statement made by a witness if the witness is given the opportunity to explain or deny the inconsistent statement and the opposing party has an opportunity to question the witness regarding the inconsistent statement. The extrinsic evidence may be either written or recorded evidence of a prior statement. *State v. Reid*, 164 S.W.3d 286, 313-14 (Tenn. 2005). However, if the witness admits to making the prior statement, then extrinsic evidence of the prior inconsistent statement is inadmissible because it would be cumulative and consistent with the witness' testimony at trial. *State v. Martin*, 964 S.W.2d 564, 567 (Tenn. 1998). Generally, this court will not overturn a trial court's decision regarding the admissibility of evidence absent an abuse of discretion. *State v. Banks*, 271 S.W.3d 90, 116 (Tenn. 2008).

It has been established on this record that just hours after the shooting, Ms. Graves spoke with the police at the hospital and gave them a statement, which was recorded. Ms. Graves does not deny that she gave this statement on that night. The defendant contends that her subsequent testimony at trial was given in "a very direct and assertive matter" in detailing the events of the evening, including a statement that the defendant "tackled [her] and throwed [her] back."

The record also established that during cross-examination, trial counsel for the defendant asked Ms. Graves several questions about statements she had made in her initial interview with police. These statements included that "he did not seem to want to hurt me" and that she could not "swear he had a gun in his hand." She also stated that the defendant was not hitting or striking, but was struggling with her over the gun. Ms. Graves told police that the defendant was "not very strong, or he is real, real gentle with me." With regard to the bite given to her by the defendant, Ms. Graves said "he did not bite [her] very hard." We know that Ms. Graves made these statements in that interview because she acknowledged that she did on cross-examination.

The defendant does not argue that Ms. Graves denied making the statements, and in fact, she did not. His argument is that because her demeanor was different from the initial interview than at trial, allowing the jury to hear the tape might have created a more favorable "atmosphere" for the defendant. He also contends that admission of the tape would have created a more accurate picture for the jury because her direct testimony was "soften[ed] considerably when taken in context with her interview with police immediately after the

incident." His contention for an abuse of discretion is based upon the differences in demeanor.

Initially, we note that the argument is not well-taken. The law in this area is clear that if the witness admits to making the prior statement, extrinsic evidence of the prior inconsistent statement is inadmissible because it would be cumulative and consistent with the witness' testimony at trial. *See Martin*, 964 S.W.2d at 567. That did not occur in this case. Ms. Graves admitted that she did in fact make the statements. The defendant is attempting to extend the law to allow evidence that she may or may not have used a different demeanor or tone on the two separate occasions.

Regardless, the defendant has waived consideration of this issue by failing to include within the record a copy of the initial interview he urges should have been admissible. The appellant in a case has a duty to prepare a record which conveys "a fair, accurate and complete account of what transpired with respect to those issues that are the bases of appeal." Tenn. R. App. P. 24(b). In the absence of an adequate record on appeal, this court must presume that the trial court's ruling was supported by the evidence. *State v. Bibbs*, 806 S.W.2d 786, 790 (Tenn. Crim. App. 1991).

## II. Photographs

Next, the defendant contends that the trial court erred by allowing into evidence prejudicial photographs of the victim's body. The admissibility of photographic evidence lies within the sound discretion of the trial court. *State v. Hall*, 8 S.W.3d 593, 602 (Tenn. 1999). Generally, Tennessee Rules of Evidence 401, 402, and 403 govern the admissibility of photographs. *Banks*, 564 S.W.2d at 949-51. Photographic evidence is relevant, and thus admissible, if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Once the trial court determines that a photograph is relevant, it must then determine whether the probative value of the photograph is substantially outweighed by the danger of unfair prejudice. Tenn. R. Evid. 403; *Banks*, 564 S.W.2d at 950-51. "Unfair prejudice" is "'[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'" *Banks*, 564 S.W.2d at 951 (quoting Tenn. R. Evid. 403, Adv. Comm'n Note).

In this case, over the defense objection, the trial court allowed admission of what the defendant characterizes as two "gruesome" photographs of the body of the victim. The State initially sought admission of three photographs and argued that each was admissible to show the manner of death of the victim during the testimony of the medical examiner. The trial court excluded one photograph, admitted one photograph in its entirety, and admitted half

of one photograph, ordering the remainder to be covered. The defendant contends that, while relevant, the probative value of the admitted photographs was substantially outweighed by the danger of unfair prejudice. His assertion is based upon his contention that the medical examiner's testimony would have been more than sufficient for the State to prove the death of the victim.

However, the State contends that the defendant has waived consideration of this issue on appeal, and we agree. Again, an appellant has a duty to prepare a record which conveys "a fair, accurate and complete account of what transpired with respect to those issues that are the bases of appeal." Tenn. R. App. P. 24(b). Here, the defendant has failed to include within the appellate record the two challenged photographs. We cannot reach a determination of whether an abuse of discretion occurred with their admission absent review of the photographs themselves. Absent a proper record, we have no basis to conclude that the trial court abused its discretion and must "conclusively presume" that the court's ruling was correct. *See State v. Bibbs*, 806 S.W.2d 786, 90 (Tenn. Crim. App. 1991). The defendant has failed to establish his entitlement to relief.

### III. Sufficiency of the Evidence

Finally, the defendant contends that the evidence presented was insufficient to find him guilty "in each and every count of the charges against him." "When the sufficiency of the evidence is challenged, the relevant question is whether, after reviewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. Dorantes*, 331 S.W.3d 370, 379 (2011); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). "[O]n appeal, the State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." *Dorantes*, 331 S.W.3d at 379 (internal quotation omitted). It is the trier of fact who resolves all questions of witness credibility, the weight and value of the evidence, as well as all factual issues raised by the evidence. *State v. Pappas*, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). Reviewing courts should neither re-weigh the evidence nor substitute their own inferences for those drawn by the jury. *State v. Evans*, 108 S.W.3d 231, 236 (Tenn. 2003).

The trial court's approval of the jury's verdict accredits the State's witnesses and resolves all conflicts in the evidence in the State's favor. *State v. Moats*, 906 S.W.2d 431, 433-34 (Tenn. 1995). "Because a guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt, on appeal a defendant bears the burden of showing why the evidence is insufficient to support the conviction." *State v. Thacker*, 164 S.W.3d 208, 221 (Tenn. 2005). These rules apply whether the verdict is predicated upon direct evidence, circumstantial evidence, or a combination of both. *Dorantes*, 331 S.W.3d at 379.

In weighing the sufficiency of the evidence, circumstantial and direct evidence are treated the same, and the State is not required to exclude every reasonable hypothesis other than that of guilt. *Id*. at 381.

The defendant was convicted of first degree felony murder, especially aggravated robbery, aggravated burglary, employing a firearm in the commission of a dangerous felony, and false imprisonment. In his brief, his argument, despite asserting a challenge to all convictions, seems to focus only on the offense of false imprisonment. Specifically, he contends that Ms. Graves' own testimony established that she continually resisted the defendant's request and that she was "never constrained in such a manner as to substantially interfere with her liberty and freedom."

First degree murder, as relevant in this case, is "[a] killing of another committed in the perpetration of or attempt to perpetrate any . . . robbery, burglary, [or] theft." T.C.A. § 39-13-202(a)(2) (2010). "Especially aggravated robbery is robbery as defined in [section] 39-13-401 . . . [a]ccomplished with a deadly weapon; and . . . [w]here the victim suffers serious bodily injury." T.C.A. § 39-13-403(a). Robbery is the intentional or knowing theft of property from the person of another by violence or putting the person in fear. T.C.A. § 39-13-401. "Aggravated burglary is burglary of a habitation as defined in [sections] 39-14-401 and 39-14-402." T.C.A. § 39-14-403(a). Burglary is defined as entering or remaining concealed in a place without the effective consent of the owner with the intent to commit a felony, theft, or assault. T.C.A. § 39-14-402. As charged in this case, "it is an offense to employ a firearm during the . . . [c]ommission of a dangerous felony." T.C.A. § 39-17-1324(b)(1). Aggravated burglary is considered a dangerous felony. T.C.A. § 39-17-1324(i)(1)(H). A person commits the offense of false imprisonment who "knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty." T.C.A. § 39-13-302(a).

"A person is criminally responsible as a party to an offense if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or by both." T.C.A. § 39-11-401(a). Criminal responsibility for the actions of another arises when the defendant, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, . . . solicits, directs, aids, or attempts to aid another person to commit the offense." T.C.A. § 39-11-402(2); *State v. Lemacks*, 996 S.W.2d 166, 170 (Tenn. 1999) ("As reflected in this case, criminal responsibility is not a separate, distinct crime. It is solely a theory by which the State may prove the defendant's guilt of the alleged offense . . . based upon the conduct of another person.").

After review of the record, we conclude that the evidence is more than sufficient to

support the crimes in this case. There is no dispute in the record that the defendant, after being privy to the planning of the robbery, donned dark colored clothing, covered his face, and entered the Graves' home. Further, the defendant admitted that he entered the home with the intent to commit a robbery and receive pills from that robbery. It is also clear that Mr. Bowman, who was acting with the defendant's help, entered the home with a weapon, and Mr. Graves died as a result of a gunshot wound from that weapon. Ms. Graves testified that the defendant also entered the home with a gun and proceeded to point that weapon at her head. Further, it is undisputed that a safe was removed from the home without the consent of the owners. Based upon this, it is clear that the evidence is sufficient to support the convictions for felony murder, especially aggravated robbery, aggravated burglary, and employing a firearm during the commission of a dangerous felony. That the defendant believed no one was home does not negate the actions he took while inside the Graves' home.

As noted, the defendant's main argument is made with regard to the conviction for false imprisonment. Specifically, his argument is based on the fact that Ms. Graves continually resisted him and failed to comply with his commands. He contends that the evidence does not establish that she was constrained in a manner so as to substantially interfere with her liberty and freedom.

We disagree with the defendant's claims. The sufficiency of the evidence for false imprisonment is not based upon the fact that the victim resisted. Proving that there was no resistence is not an element of the offense. While Ms. Graves did resist the defendant, that does not mean that her liberty was not constrained or interfered with. The defendant knowingly entered the home, armed with a gun, and placed that gun to Ms. Graves head in furtherance of a robbery. During the ensuing struggle, the defendant physically manhandled Ms. Graves, admitting that he pinned her to the ground at one point and shoved her head into the loveseat. Viewing the evidence in its entirety, and in the light most favorable to the State, we conclude that these facts are sufficient to establish the conviction. The defendant is not entitled to relief.

Having concluded that the evidence is sufficient to support the false imprisonment conviction under a standard sufficiency review, we turn now to a possible due process issue, although raised by neither the State nor the defendant, which could affect the validity of the conviction. For years, possible violations of due process with regard to kidnapping and false imprisonment crimes were governed by *State v. Anthony*, 817 S.W.2d 299, 300 (Tenn. 1991) and *State v. Dixon*, 957 S.W.2d 532, 535 (Tenn. 1997). Under *Anthony*, the test to be applied on appellate review was: "whether the confinement, movement, or detention is essentially incidental to the accompanying felony and is not, therefore, sufficient to support a separate conviction for kidnapping, or whether it is significant enough, in and of itself, to warrant

independent prosecution and is, therefore, sufficient to support such a conviction." *Anthony*, 817 S.W.2d at 306. The standard was amended to a two part test by the *Dixon* court, that being: (1) whether the defendant's movement or confinement of the victim was beyond that necessary to consummate the accompanying felony, and, if so; (2) whether the additional movement or confinement prevented the victim from summoning assistance, lessened the defendant's risk of detection, or created a significant danger or increased the victim's risk of harm. *Dixon*, 957 S.W.2d at 535. In *State v. Richardson*, 251 S.W.3d 438, 443 (Tenn. 2008), our supreme court recognized that the test set forth in *Dixon* replaced the *Anthony* test.

However, in 2012, the Tennessee Supreme Court explicitly overruled *Anthony* and its progeny, including *Dixon* and *Richardson*. *State v. White*, 362 S.W.3d 559, 578 (Tenn. 2012). The court, in analyzing whether the defendant's dual convictions for aggravated robbery and especially aggravated kidnapping could stand, rejected *Anthony*'s reliance on an appellate court's due process scrutiny of kidnapping convictions imposed in conjunction with convictions of an accompanying felony. *Id*. at 577-78. Rather, the court shifted the appellate analysis to a standard sufficiency of the evidence review of a *properly instructed* jury's assessment of the facts. *Id*. The court further emphasized that it was the *jury's* "primary obligation . . . to ensure that a criminal defendant has been afford due process." *Id*. at 577. The court, in order to ensure that the jury can carry out its function, delineated a specific jury instruction to be given:

> To establish whether the defendant's removal or confinement of *the victim* constituted a substantial interference with his or her liberty, the State must prove that the removal or confinement was to a greater degree than that necessary to commit the offense of [insert offense], which is the other offense charged in this case. In making this determination, you may consider all the relevant facts and circumstances of the case, including, but not limited to, the following factors:
>
> - the nature and duration of *the victim's* removal or confinement by the defendant;
> - whether the removal or confinement occurred during the commission of the separate offense;
> - whether the interference with *the victim's* liberty was inherent in the nature of the separate offense;
> - whether the removal or confinement prevented *the victim* from summoning assistance, although the defendant need not have succeeded in preventing *the victim* from doing so;
> - whether the removal or confinement reduced the defendant's risk of detection, although the defendant need not have

-13-

succeeded in this objective; and

• whether the removal or confinement created a significant danger or increased *the victim's* risk of harm independent of that posed by the separate offense.

*Id*. at 580-581 (footnote omitted) (emphases added). In *Cecil*, our supreme court made clear that *White* applied to cases then in the appellate "pipeline." *State v. Cecil*, 409 S.W.3d 599, 608 (Tenn. 2012).[1]

The case also instructs that this instructional deficit, if the instruction is not given, is a constitutional error. *Id*. at 610. Such a non-structural constitutional error mandates reversal unless the State demonstrates beyond a reasonable doubt that the error was harmless. *Id*. (citing *State v. Rodriguez*, 254 S.W.3d 361, 371 (Tenn. 2008)). "[T]he touchstone of this inquiry is whether a rational trier of fact could interpret the proof at trial in different ways." *Id*. (citing *White*, 362 S.W.3d at 579). If the proof could be interpreted in a manner that would not support a defendant's kidnapping conviction, then the defendant is entitled to a new trial  *Id*. at 611-12.

As an initial matter, we note that the *White* opinion had been issued prior to the hearing on the motion for new trial in this case, and the issue should have been raised in the trial court. In addition to that omission, neither party has raised the issue on appeal. Thus, we may reach this issue only by plain error review. *See* Tenn. R. App. P. 36(b). In this case, the record reveals that the *White* instruction was not given to the jury.[2]

Before turning to our review of whether the defendant's due process rights were violated by this failure, we acknowledge that panels of this court have reached differing conclusions on this issue. However, we respectfully disagree with the dissent and adopt the conclusion and analysis set forth in *State v. Ricco R. Williams*, No. W2011-02365-CCA-RM-CD, 2014 Tenn. Crim. App. LEXIS 11 (Tenn. Crim. App. Jan. 7, 2014); *see also State v. Jerome Maurice Teats*, No. M2012-01232-CCA-R3-CD, 2014 Tenn. Crim. App. LEXIS 18

---

[1]At this juncture, we note that we are not convinced that this case was in the appellate "pipeline," as we believe our supreme court used the term. The defendant was convicted and sentenced in 2011. On May 26, 2011, he filed a timely motion for new trial, which was later amended on April 27, 2012. Following a May 1, 2012 hearing, the court filed a written order denying the motion on May 7, 2012. The defendant filed notice of appeal on May 29, 2012, more than two months are the March 9, 2012 filing of *White*. Thus, at the time of his filing of his notice of appeal to begin the appellate process, *White* had already been decided and filed. Nonetheless, in the interest of justice and finality, we briefly address the issue.

[2]We do not fault the trial court for failing to give a jury instruction which had not yet been promulgated at the time of the 2011 trial.

(Tenn. Crim. App. Jan. 10, 2014); *State v. Gregory Mathis*, No. M2011-01096-CCA-R3-CD, 2013 Tenn. Crim. App. LEXIS 757 (Tenn. Crim. App. Sept. 5, 2013); *State v. Richard Lacardo Elliot*, No, M 2001-01990-CCA-R3-CD, 2002 Tenn. Crim. App. LEXIS 987 (Tenn. Crim. App. Nov. 15 2002); *but see State v. Josh L. Bowman*, No. E2012-00923-CCA-R3-CD, 2013 Tenn. Crim. App. LEXIS 735 (Tenn. Crim. App. Aug. 29, 2013).[3]

The majority in *Williams* notes that the *White* instruction appears to have been drafted with the assumption that the defendant is being tried for dual offenses against a single victim. *Ricco R. Williams*, 2014 Tenn. Crim. App. LEXIS 11, at *21. The *Williams* majority also noted our supreme court's reliance upon *State v. Salamon*, 949 A.2d 1092, 1120 (Conn. 2008), a case which involved a single victim, in which the court "clarified that the jury was to be instructed that 'if it finds that the defendant's restraint of *the victim* was merely incidental to the defendant's commission of another crime against *the victim*, that is, assault, then it must find the defendant not guilty of the crime of kidnapping.'" *Id*. (citing *White*, 362 S.W.3d at 579 n.15) (emphasis added). The *Williams* majority noted that "[l]ogic dictates that, if the *White*, court intended the instruction to be required in cases involving a kidnapping charge that was not accompanied by a robbery (or rape) charge involving *the same victim*, the *White* court would have phrased the instruction as "the victim *of the underlying felony*." *Id*. at *21-22 The *Williams* majority "read *White* as requiring the expanded kidnapping charge only when the jury is required to determine whether the defendant committed dual offenses of kidnapping and an accompanying crime for which some measure of detention was necessary *against* the *same victim*." *Id*. at *24-25. We are persuaded the conclusion reached was the correct one and conduct our review of the defendant's conviction within those parameters.

In this case, the defendant was convicted of the false imprisonment of Ms. Graves and the aggravated robbery of Mr. Graves, as he was the only named victim on the indictment issued for the robbery. Thus, the false imprisonment conviction in this case presents a significantly different situation than the situation which triggered the underlying concerns our supreme court first articulated in *Anthony*. The defendant was convicted of only one crime against Ms. Graves; there is no accompanying felony. Due process did not require that

---

[3]The need for guidance and clarification on this issue is demonstrated by the outcomes of the three defendants involved in this one crime. As cited above, *Josh L. Bowman* was indicted and tried for the same crimes as the instant defendant, including the especially aggravated kidnapping of Ms. Graves. He raised the *White* issue on appeal and was granted a new trial on that charge. *See Josh L. Bowman*, 2013 Tenn. Crim. App. LEXIS 735, *37-48. As we noted within this opinion, the defendant, Mr. Holman, who was convicted only of false imprisonment, did not raise the issue. Nonetheless, we have afforded review, but concluded he was not entitled to relief. The third defendant, Chad Medford, likewise did not raise the *White* issue, and he was afforded no review through plain error. *State v. Chad Medford*, No. E2012-00335-CCA-R3-CD, 2013 Tenn. Crim. App. LEXIS 475 (Tenn. Crim. App. June 5, 2013).

the instruction be given in this case. Having previously determined that the evidence is sufficient under a sufficiency standard, we conclude that the defendant is entitled to no relief.

## CONCLUSION

Based upon the foregoing, the judgments of conviction are affirmed.

_____

JOHN EVERETT WILLIAMS, JUDGE